FILED & ENTERED

MAR 19 2014

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egarcia    DEPUTY CLERK

# NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 2:13-bk-27391-PC |
| | ) | |
| JACK TSAI, | ) | Chapter 11 |
| | ) | |
| | ) | **MEMORANDUM DECISION** |
| | ) | |
| | ) | Date:   March 10, 2014 |
| | ) | Time:   9:00 a.m. |
| | ) | Place:  United States Bankruptcy Court |
| | ) |            Courtroom # 1468 |
| Debtor. | ) |            255 East Temple Street |
| | ) |            Los Angeles, CA  90012 |

Debtor, Jack Tsai ("Tsai") seeks an order estimating the unliquidated and disputed claims of Mei Yun Yang ("Yang") pursuant to § 502(c) of the Bankruptcy Code. [1]  Having considered

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005).  "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P.").  "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

the papers, the evidentiary record, and arguments of counsel, the court makes the following

findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a), as incorporated into FRBP

7052 and applied to contested matters by FRBP 9014(c).

## I.   STATEMENT OF FACTS

On July 5, 2013, Tsai filed a voluntary petition under chapter 11 of the Code.  Tsai's

father is Chin Ming Tsai ("Mike"), and his mother is Pao Ching Tsai ("Grace").  Grace is Yang's

sister, and Mike is Yang's brother-in-law.  Tsai is Yang's nephew.

Mike formed J.T. Thompson USA ("JTT"), a real estate development company, in 1999.

Mike was the President, CEO, and sole shareholder of JTT.  Grace was the CFO of the

corporation.  Tsai was not a director or shareholder of JTT, and was not an officer of the

corporation until the end of 2009.  Mike and Grace ran the company.

Tsai began working as an employee of JTT in 2007.  His duties included translating

documents and running errands.  Tsai testified that he worked full-time for approximately 5

months in 2007, and continued to work for JTT in the same capacity in 2008.  After becoming a

licensed real estate agent in 2009, Tsai's duties began to change at JTT.  Mike left the country

for China in approximately 2010 and returned in 2011.  During his absence, Tsai managed the

affairs of JTT.  JTT filed a voluntary chapter 7 petition in Case No. 2:12-bk-26473-PC, In re J.T.

Thompson, Debtor, in the United States Bankruptcy Court, Central District of California, Los

Angeles Division, on May 9, 2012.  In its schedules, JTT disclosed Mike as its President, CEO,

and sole shareholder.  Grace was disclosed as CFO and Tsai as Secretary of the corporation.

When Tsai filed his personal bankruptcy the following year, Tsai was a defendant in Case

No. GC 049025, styled Yang v. J.T. Thompson USA, et al., pending in the Superior Court of

California, County of Los Angeles, in which Yang was seeking, in pertinent part, a judgment

against JTT, Mike, Grace and Tsai for damages on 24 separate causes of action, including

alleged breach of contract, breach of fiduciary duty, constructive fraud, inducing breach of

contract, conversion, fraudulent transfer of real and personal property, civil conspiracy, aiding

and abetting breach of contract, fraud, negligent management, negligent misrepresentation, and

unfair business practice.  On August 30, 2013, Yang filed the following proofs of claim in this case:

1.  Proof of Claim # 7-1 filed by Yang in her individual capacity in the amount of $390,289.54 for alleged breach of contract, fraud, and conversion.[2]

2.  Proof of Claim # 8-1 filed by Yang, as successor-in-interest to the bankruptcy estate of J.T. Thompson USA, in the amount of $795,100.00 for alleged fraud, conversion, embezzlement, and breach of fiduciary duty.[3]

On December 31, 2013, Debtor Jack Tsai's Motion to Estimate Mei Yun Yang's Claims Pursuant to Section 502(c) of the Bankruptcy Code ("Tsai's Motion") was filed in this case.  Tsai seeks an order "estimating [Yang's] Claims no. 7 and no. 8 as General unsecured claims with a value of zero dollars for all purposes in this chapter 11 case, including allowance, voting, and distribution under [Tsai's] Plan of Reorganization."[4]  On January 8, 2014, Yang filed her Opposition to Debtor Jack Tsai's Motion to Estimate Mei Yun Yang's Claims Pursuant to Section 502(c) of the Bankruptcy Code ("Yang Opposition").  Yang argues that her claims are not subject to estimation under § 502(c) because neither claim is contingent or unliquidated.  Alternatively, Yang argues that Claim # 7-1 should be estimated at $390,289.54 and Claim # 8-1 should be estimated at $795,100.00.  After an initial hearing on January 22, 2014, the court held a continued hearing on March 10, 2014, at which the court received exhibits into evidence and heard the testimony of witnesses pursuant to FRBP 9014(d) with respect to disputed material factual issues.  At the conclusion of the evidence, the court heard final arguments and took the matter under submission.

---

[2]  On October 4, 2013, Yang filed a complaint in Adversary No. 2:13-ap-01999-PC, Yang v. Tsai, seeking to have the claims made the basis of Claim # 7-1 declared nondischargeable under § 523(a)(2), (a)(4) and (a)(6).  The adversary proceeding is pending before the court.

[3]  On October 4, 2013, Yang, as successor-in-interest to the bankruptcy estate of J.T. Thompson USA, filed a complaint in Adversary No. 2:13-ap-02000-PC, Yang v. Tsai, seeking to have the claims made the basis of Claim # 8-1 declared nondischargeable under § 523(a)(2), (a)(4) and (a)(6).  The adversary proceeding is pending before the court.

[4]  Tsai Motion, 4:13-16.

1
2
3
## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  "The bankruptcy court has core jurisdiction to estimate claims for purposes of confirming a chapter 11 plan."  In re Roman Catholic Archbishop of Portland in Or., 339 B.R. 215, 219 (Bankr. D. Or. 2006).  Venue is appropriate in this court.  28 U.S.C. § 1409(a).

### A.  Yang's Claims Must Be Estimated Under § 502(c)(1).

Section 502(c)(1) states that "[t]here shall be estimated for purpose of allowance . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."  11 U.S.C. § 502(c)(1).[5]  Bankruptcy courts may estimate or temporarily allow a contingent or unliquidated claim for a variety of reasons in a chapter 11 case.  See, e.g., Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374, 1382 (9th Cir. 1985) ("Until the bankruptcy court has estimated the value4 of Shakey's claim, it is impossible to determine whether $291,295.99 is sufficient to effectuate the plan and enable Pizza to continue in business."); In re Trident Shipworks, Inc., 247 B.R. 513, 514 (Bankr. M.D. Fla. 2000) ("[T]he estimation proceeding may be used for the purpose of voting on a Plan of Reorganization, and also to determine the allowed amount for distribution purposes.").  "When actual liquidation of claims would unduly delay administration of the bankruptcy estate, estimation is mandatory."  Roman Catholic Archbishop, 339 B.R. at 219.

The court rejects Yang's assertion that her claims are neither contingent or unliquidated, and therefore, not subject to estimation under § 502(c).  Yang's proofs of claim each involve unliquidated and disputed tort claims against Tsai.  Of the twenty four causes of action alleged in the state court complaint, only three relate to breach of contract.  The remaining causes of action are tort causes of action for, among other things, fraud, conspiracy, embezzlement, breach of

---

[55]   FRBP 3018(a) further provides, in pertinent part, that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting the plan."

fiduciary duty and negligence.  Yang admits that Claim # 8-1 is based on embezzlement.[6]  Yang

further admits that Claim # 7-1 is "primarily based on [Tsai's alleged] fraud in diverting funds

held in trust by [JTT] for the benefit of creditors, including [Yang]," and Tsai's alleged breach of

a "fiduciary duty owed to [JTT's] creditors by diverting [JTT's] assets and misappropriating

[JTT's] funds while [JTT] was insolvent."[7]  While breach of contract may be one of the many

causes of action alleged in Yang's state court complaint, Yang's unliquidated and disputed tort

claims form the basis for Claim # 7-1 and Claim # 8-1.  Neither claim is liquidated because they

are not subject to ready determination and precision.  See Fostvedt v. Dow (In re Fostvedt), 823

F.2d 305, 306 (9th Cir. 1987) ("[W]hether a debt is liquidated turns on whether it is subject to

'ready determination and precision in computation of the amount due.'" (citation omitted)).

Secondly, estimation of Yang's Claim # 7-1 and Claim # 8-1 for purposes of voting and

confirmation issues is necessary to avoid undue delay in determining confirmation of Tsai's plan

of reorganization.  On September 5, 2013, the court lifted the automatic stay at Yang's request to

permit Yang to proceed to judgment in the state court on the claims made the basis of her

complaint.  At that time, Yang represented to the court that a trial date was scheduled for

November 25, 2013.  After receiving relief from the stay, however, Yang sought a continuance

of the trial date to conduct further discovery.  Even though a trial is now set for May 27, 2014,

Yang admits that discovery remains pending in the state court action.[8]  At this point, the court

has little reason to believe a state court trial will be commenced on May 27 and concluded

shortly thereafter.  But even if a trial was concluded and judgment entered, there will likely be an

appeal and further proceedings before any judgment liquidating Yang's claims becomes final.

Liquidation of the claims is not necessary for purposes of determining confirmation issues under

§ 1129, such as feasibility and the best interests test.  Requiring Tsai to wait until Yang's

---

[6] Yang Opposition, 3:14-18.

[7] Id. at 7:5-8.

[8] Id., at 2:21 ("There are currently pending discoveries propounded by the parties in the State
Court Action.").

disputed claims are completely liquidated in state court before determining the confirmation

issues under § 1129 would result in undue delay.

Finally, the estimation of an unliquidated claim for the limited purpose of confirmation

has no collateral estoppel effect with respect to the merits of the claim. <u>In re Hungerford</u>, 2001

WL 36211305, at *12 (Bankr. D. MT 2001).  "Where a claim is estimated, and the determination

of its ultimate validity is postponed until after confirmation, <u>res judicata</u> will not prevent further

litigation regarding the claim."  <u>In re Clark</u>, 172 B.R. 701, 705 n.5 (Bankr. S.D. Ga 1994).  "The

order of confirmation works together with the order on the claim to reserve consideration of the

claim to a later date, so the issue cannot be said to have been finally determined."  <u>Id.</u>

   B.  <u>Method of Estimation</u>.

The method used to estimate the value of a contingent and unliquidated claim is subject

to the court's discretion.  <u>See, e.g.</u>, <u>Ryan v. Loui (In re Corey)</u>, 892 F.2d 829, 834 (9th Cir. 1989)

("A court has broad discretion when estimating the value of an unliquidated claim"); <u>Matter of</u>

<u>Brints Cotton Mktg., Inc.</u>, 737 F.2d 1338, 1341 (5th Cir. 1984) ("'In estimating a claim, the

bankruptcy court should use whatever method is best suited to the circumstances.'" (citation

omitted)).  But "[t]he bankruptcy court must follow 'the substantive law governing the nature of

the claim (such as following contract law when estimating a breach of contract claim).'" <u>Falk v.</u>

<u>Falk (In re Falk)</u>, 2013 WL 5405564, at *7 (9th Cir. BAP 2013) (quoting <u>In re Pac. Gas & Elec.</u>

<u>Co.</u>, 295 B.R. 635, 642 (Bankr. N.D. Cal. 2003)).

The court need only "reasonably estimate the probable value of the claim."  <u>Pac. Gas &</u>

<u>Elec. Co.</u>, 295 B.R. at 642 (quoting <u>Matter of Fed. Press Co.</u>, 116 B.R. 650, 653 (Bankr. N.D.

Ind. 1989)).  Where the claimant is unlikely to recover under applicable nonbankruptcy law, the

claim may properly be estimated at zero.  <u>See</u> <u>Bittner v. Borne Chem. Co., Inc.</u>, 691 F.2d 134,

(3d Cir. 1982) ("Assuming . . . that the bankruptcy court did estimate their claims according to

their ultimate merits rather than the present value of the probability that they would succeed in

their state court action, we cannot find that such a valuation method is an abuse of the discretion

conferred by section 502(c)(1).").  <u>See also</u> <u>Falk</u>, 2013 WL at *8 (The bankruptcy court

"estimated Claim # 21 at zero because it believed it was inappropriate for it to decide how the

Community Property Assets should be divided and saw no reason to hold up distributions to other creditors.").

    C.  <u>Yang's Claim # 7-1</u>.

Yang's Claim # 7-1 in the amount of $390,289.54 is divided into six parts:

    a.  Claim # 1 -- $62,509.59 representing the principal sum of $40,000, plus accrued interest, attributable to a distribution allegedly due Yang on November 20, 2007, from Rosemead S.G., LLC ("Rosemead").

    b.  Claim # 2 -- $15,353.42 representing the principal sum of $10,000.00, plus accrued interest, attributable to a distribution allegedly due Yang on February 28, 2008, from Rosemead.

    c.  Claim # 3 -- $256,153.42 representing the principal sum of $200,000.00, plus accrued interest, attributable to a series of personal loans allegedly made by Yang to JTT, beginning on January 1, 2010.

    d.  Claim # 4 – $13,419.18 representing the principal sum of $10,000.00, plus accrued interest, attributable to a distribution allegedly due Yang on February 3, 2010, from San Gabriel Senior Garden, LLC ("San Gabriel").

    e.  Claim # 5 -- $26,504.11 representing the principal sum of $20,000.00, plus accrued interest, attributable to a distribution allegedly due Yang on April 5, 2010, from San Gabriel.

    f.  Claim # 6 -- $16,349.82 representing the principal sum of $14,098.00, plus accrued interest, attributable to a distribution allegedly due Yang on November 30, 2011, from San Gabriel.

Yang asserts that Tsai, "acting in concert with his parents in the capacity of [JTT's] directors and officers, defrauded [Yang] of her money held in trust by [JTT] in the amount of $390,289.54."[9] Yang further asserts that her claims "are primarily based on [Tsai's alleged] fraud in diverting

---

[9]  <u>Id.</u> at 7:2-4.

7

funds held in trust by [JTT] for the benefit of creditors including [Yang], and [Tsai's alleged breach of] his fiduciary duty owed to [JTT's] creditors by diverting [JTT's] assets and misappropriating [JTT's] funds while [JTT] was insolvent."[10]

1. Rosemead Distributions

Rosemead was a real estate development project.  JTT owned 15% of the project.  On February 12, 2004, Yang paid JTT the sum of $63,000 to acquire a 5% interest in Rosemead. JTT kept the remaining 10%.  Yang testified that she negotiated the purchase with Mike, and thereafter received distributions on account of her interest in Rosemead from Mike.  She had no discussions with Tsai in conjunction with the purchase of her interest in Rosemead from JTT. Yang did not introduce any admissible evidence at the hearing to establish either that Rosemead made distributions to its investors that she did not receive or the amount of such distributions. Yang's testimony to the effect that she later learned of the dates and amounts of unpaid Rosemead distributions from conversations with unnamed third parties was stricken as hearsay. There was no evidence from either Rosemead or JTT confirming the dates, times and amounts of actual distributions by Rosemead to its investors nor any verifiable accounting establishing the amounts that may not have been paid to Yang.  Indeed, Yang testified that she had not inspected the books and records of either Rosemead or JTT to confirm that Rosemead made distributions that were not received by her.

2. San Gabriel Distributions

San Gabriel was also a real estate development project.  JTT owned 15% of the project. On February 12, 2004, Yang paid JTT the sum of $52,500 to acquire a 5% interest in Rosemead. JTT kept the remaining 10%.  Again, Yang testified that she negotiated the purchase with Mike, and thereafter received distributions on account of her interest in San Gabriel from Mike.  She had no discussions with Tsai in conjunction with the purchase of her interest in San Gabriel from JTT.  Yang did not introduce any admissible evidence at the hearing to establish either that San Gabriel made distributions to its investors that she did not receive or the amount of such

---

[10] Id., at 7:5-8.

distributions.  Again, Yang's testimony to the effect that she later learned of the dates and amounts of unpaid San Gabriel distributions from conversations with unnamed third parties was stricken as hearsay.  There was no evidence from either Rosemead or JTT confirming the dates, times and amounts of actual distributions by San Gabriel to its investors nor any verifiable accounting establishing the amounts that may not have been paid to Yang.  Yang did not inspect the books and records of either San Gabriel or JTT to confirm that San Gabriel made distributions that were not received by her.

     3.   JTT $250,000 Loan

     According to the evidence, Yang made a series of cash advances to JTT totaling $250,000.  JTT repaid the principal sum of $150,000, plus accrued interest until 2009.  However, the principal balance of $200,000, plus accrued interest after 2009, remained unpaid at the time of JTT's bankruptcy.  Yang's loans to JTT were not personally guaranteed by either Mike, Grace or Tsai.

     At the time the cash advances were made to JTT, Tsai was 19 years old.  He was not an officer, director, shareholder or employee of JTT.  Yang testified that Mike approached her regarding the cash advances, and that Mike stated JTT needed money for operations.  Yang negotiated the terms of each cash advance with Mike.  Tsai was not present nor a party to any of the discussions.  Yang testified that each cash advance was to bear interest at 8% per annum until paid, and that each cash advance was to be repaid "promptly."  However, there is no evidence that any of the cash advances was reduced to a promissory note or other written document reflecting the amount loaned, the parties to the loan, the interest rate, and the terms of repayment.  There is no notation on any of Yang's  four cancelled checks, which ostensibly evidence the cash loaned to JTT, referencing any loan between Yang and JTT.  There is simply little evidence in the record, other than Yang's testimony, to confirm the existence of the loans by Yang to JTT, the terms of each loan, and the balance of principal and accrued interest allegedly due by JTT on each of the loans at the time of its bankruptcy.

     4.   There is Insufficient Evidence to Hold Tsai Personally Liable for JTT's Debts

Even if the evidence supported a finding that JTT owed the amounts claimed by Yang on account of unpaid cash advances to JTT and unpaid distributions attributable to Rosemead and San Gabriel, Tsai's personal liability for such amounts hinges on proof that (a) Tsai was an officer of JTT at a time when JTT was insolvent; and (b) Tsai breached a fiduciary duty JTT's creditors, including Yang, by engaging in conduct that diverted, dissipated, or unduly risked corporate assets that might otherwise had been used to satisfy creditors' claims.

California recognizes the "trust fund doctrine" which imposes a fiduciary obligation on corporate officers and directors in favor of the corporation's creditors when the corporation is insolvent.  See Berg & Berg Enterprises, LLC, v. Boyle, 178 Cal.App.4th 1020, 1040 (2009). When a corporation is insolvent, an officer may face liability for diverting, dissipating, or unduly risking corporate assets that might otherwise had been used to satisfy creditors' claims.  Id. at 1040-41.  However, no fiduciary duty to creditors arises in California when a company is in the so-called "zone of insolvency."  Id. 1041. ("[W]e hold that there is no fiduciary duty prescribed under California law that is owed to creditors by directors of a corporation solely by virtue of its operating in the 'zone' or 'vicinity' of insolvency.").  Other states have also rejected the zone of insolvency theory and impose a fiduciary obligation on directors and officers to act for the benefit of a corporation's creditors only when the corporation is actually insolvent.  N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101 (Del Supr. 2007). See also Newsome v. Gallacher, 722 F.3d 1257, 1270 (10th Cir. 2013).

Proof of actual insolvency requires that admissible evidence satisfy a cognizable standard for establishing insolvency.  For example, corporate insolvency can be established under the balance sheet test by proof that the amount of liabilities exceed the value of the corporation's assets.  See In re Kallmeyer, 242 B.R. 492, 496-97 (9th Cir. BAP 1999). Alternatively, a creditor may prove that a debtor is presumptively insolvent by evidence that a debtor is not paying its debts as they become due. See In re GSM Wireless, Inc. v. Honarkar (In re GSM Wireless, Inc.), 2013 WL 4017123, * 22 (Bankr. C.D. Cal. 2013).  "In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness.  The court should also take into account such

factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments." Id. " The court must 'compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the non-payment, and the nature of the debtor's conduct of its financial affairs.'" Id. (citation omitted).

Tsai served as Secretary of JTT from the end of 2009 until 2012, and managed the affairs of JTT in Mike's absence in 2010.  To establish Tsai's liability under the trust fund doctrine, Yang had the burden of establishing that JTT was actually insolvent between late 2009 and 2012, and that during such insolvency, Tsai engaged in conduct that diverted, dissipated, or unduly risked corporate assets that might otherwise had been used to satisfy the claims of Yang and other creditors.  Yang did not undertake to establish that JTT was not paying its debts as they came due.  To establish insolvency, Yang points to JTT's federal income tax returns for fiscal years 2007, 2008, 2009 and 2010 in which JTT reported a taxable loss each year.  The court notes that Schedule L, entitled "Balance Sheet per Books" of JTT's 2009 federal income tax return shows that JTT's liabilities exceeded its assets at the end of FY 2009.  Similarly, Schedule L of JTT's 2010 federal income tax return reflects a negative net worth at the end of FY 2010. But even assuming the court could make a finding of JTT's insolvency based on such evidence, there is no evidence that during such period Tsai, as an officer of the corporation, engaged in conduct that diverted, dissipated, or unduly risked corporate assets that might otherwise had been used to satisfy creditors' claims.

D.  Yang's Claim # 8-1.

Yang's Claim # 8-1 in the amount of $795,100 is divided into two parts:  (1) Claim #1 – Four transfers from H.J. Famous USA Corp. ("H.J. Famous") to Tsai between 2007 and 2010 totaling $125,100; and (2) Claim # 2(a) – Sixteen transfers between February 14, 2007 and May 10, 2010, totaling $670,000 and described as "Funds Embezzled by [Mike] and [Tsai] from

[JTT]."[11]  Yang asserts that Claim # 8-1 is "primarily based on [Tsai's] and his parents' fraud in embezzling and diverting [JTT's] funds for their personal benefits, and [breach of] their fiduciary duties owed to [JTT] and its creditors by diverting [JTT's] assets and misappropriating [JTT's] funds while [JTT] was insolvent."[12]

    1.  <u>H.J. Famous Transfers</u>

H.J. Famous, a wholly-owned subsidiary of JTT, was formed in 2007 to engage in the business of real estate development.  In her opposition, Yang states that that Tsai admitted at his deposition that he did not work for H.J. Famous.[13]  However, Tsai's deposition testimony was not admitted into evidence because Yang failed to lodge the original deposition with the court prior to the hearing and serve excerpts of the deposition testimony sought to be admitted in accordance with LBR 7030-1(b).  At the hearing, Tsai testified that he did not actually work for H.J. Famous, and that he was unaware or did not understand that he had been treated as an employee of H.J. Famous between 2007 and 2010.  Tsai testified that the transfers at issue were the work of his father and that he had no knowledge of them until after Yang's lawsuit was filed.  The court gives little weight to Tsai's testimony, particularly in light of the fact that Tsai received a W-2 from H.J. Famous in 2007, 2008, 2009 and 2010, and reported the amounts received from H.J. Famous as income in his federal income tax returns for each of those years.

Jean Huang, who has been a Certified Public Accountant for the past 20 years, testified that she prepared the income tax returns for H.J. Famous from the time it was incorporated in 2007.  In conjunction with preparation of H.J. Famous's tax returns, Huang was instructed by Mike to issue a W-2 to Tsai from H.J. Famous.  According to Huang, Tsai knew about the W-2s from H.J. Famous.  Huang testified that she prepared Tsai's tax returns in 2007

[11] Yang conceded at the hearing that Claim # 2(b), which was separately listed in Claim # 8-1 as three transfers between February 24, 2010 and May 10, 2010, totaling $251,415.14 and described as "Fraudulent transfer from Tsai to Debtor" are duplicative of a portion of Claim # 2(a).

[12] Yang Opposition, 3:23-26.

[13] <u>Id.</u>, at 4:3-5.

and later, and that the income received by Tsai from H.J. Famous, as reflected on each W-2, was reported annually on Tsai's individual income tax returns.

Tsai unquestionably received the funds from H.J. Famous, but there is little evidence to support Yang's theory that he did so as an active and knowing participant in a scheme to defraud creditors of JTT.  There is no evidence that Tsai was an officer or director of H.J. Famous when he was paid as an employee of the corporation.  Nor is there any evidence that he was authorized to sign on any financial accounts in the name of H.J. Famous.  Tsai was Secretary of JTT from the end of 2009 to approximately 2012, and managed the affairs of JTT when Mike was in China in 2010.  Beginning in 2010, Tsai began signing checks on JTT's Citibank account to pay the debts of JTT incurred in the ordinary course of business, such as the telephone bill, utility bill, and other small invoices.  He testified that he was an authorized signatory on JTT's Citibank account and East West Bank account beginning in 2010, but that he did not have authority to sign checks on either account prior to 2010.  On cross-examination, Tsai testified that he did not sign any checks for JTT or H.J. Famous while Mike was in the United States nor did he sign any checks on behalf of JTT or H.J. Famous payable to Mike, Grace or himself.

      2.  Loans from Shareholders

Huang testified that she had prepared JTT's income tax returns since 1999, and had been Mike's personal accountant since 1999.  Huang testified that Mike made personal loans to JTT which were disclosed under "Loans from Shareholders" in Schedule L of JTT's federal income tax returns.  For example, JTT's federal income tax return for fiscal year 2007 shows that loans from shareholders increased from $463,801 to $612,885, and Schedule L of JTT's federal income tax return of fiscal year 2008 shows that loans from shareholders decreased from $612,885 to $446,611.  Huang further testified that she prepared an accounting of the loans made by Mike to JTT for use in preparing JTT's income tax returns as well as Mike's income tax returns.  The accounting, which was admitted as Exhibit 19, itemizes each of the loans made by Mike to JTT, the interest accruing on the loans, and the payments made by JTT to Mike on the loans between January 1, 2007 and July 31, 2010.  Huang testified that the information contained in the accounting was derived from her review of JTT's ledgers and bank account records.

Huang testified that Mike received a Form 1099 from JTT for the amount of interest paid by JTT to Mike each year on account of the loans to the corporation.  Mike reported the interest received from JTT as reflected in each Form 1099 as income in his personal income tax returns.  Each of the checks listed under Claim 2(a) in Yang's Claim 8-1 and characterized by Yang as funds embezzled from JTT by Mike and Tsai are, in fact, traceable to payments by JTT to Mike between January 1, 2007 and July 31, 2010, on account of loans made by Mike to JTT.  There is no evidence that Tsai made any loans to JTT or that Tsai received any of the payments listed in Yang's proof of claim.

Tsai does not deny receiving as gifts cash from his father totaling $251,415.14 which he used to purchase the real property and improvements at 231 East Camino Real, Monrovia, California.  However, the evidence points to the conclusion that Mike's funds to make such gifts were derived, not from embezzlement, but from JTT's loan repayments to him.

The essential elements of embezzlement are the fiduciary relation arising where one in trusts property to another, and the fraudulent appropriation of the property by the latter." Breceda v. Superior Court of Los Angeles County, 215 Cal.App.4th 934, 956 (2013).  An officer who participates in management of a corporation is a fiduciary of the corporation. Cadle Co. Il, Inc. v. Bell, 2011 WL 3525407, at * 5 n.4 (2011). "[F]raudulent intent is an essential element of the offense of embezzlement..." Breceda, 215 Cal.App.4th at 956.  In this case, there is no credible evidence in the record upon which the court can base a finding that (1) Tsai personally embezzled funds from JTT; (2) Tsai knowingly acted in concert with his father to embezzle funds from JTT; or (3) knowingly acted in concert with Mike to use funds embezzled from JTT to acquire the Monrovia property.

## CONCLUSION

Based upon the foregoing, the court will grant Tsai's motion, in part and deny the motion, in part.  The court will estimate each of Yang's proofs of claim, Claim # 7-1 and Claim # 8-1, at zero solely for purposes of voting and adjudicating confirmation issues.  Estimation of Yang's claims is necessary to avoid undue delay in determining confirmation of Tsai's plan of reorganization.  The court declines Tsai's request that Claim # 7-1 and Claim # 8-1 be estimated

1  for purposes of final allowance and distribution under the plan.  The claims will be liquidated in

2  state court.

3        The court will enter a separate order consistent with this Memorandum Decision.

4                                    ###

23

24  Date: March 19, 2014

25                                    Peter H. Carroll
                                      United States Bankruptcy Judge